## LESTER v. GRAHAM.

(Supreme Court, Appellate Division, First Department.   July 10, 1913.)

1. MASTER AND SERVANT (§ 321*)—INJURIES TO SERVANT—SCAFFOLDS—STATUTORY PROVISIONS.

   Where a subcontractor was killed by the falling of a scaffold erected by the principal contractor, and to be used in the construction of a building, which fall was occasioned by the fact that a derrick used by an independent contractor was allowed to lean against the scaffold, the contractor is liable under Labor Law (Consol. Laws 1909, c. 31) § 18, providing that a person employing or directing another to perform labor in the erection of a building shall not furnish unsafe scaffolding, if he knew or could have known prior to the accident that the scaffold had become unsafe by reason of the derrick leaning against it.

   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1262; Dec. Dig. § 321.*]

2. MASTER AND SERVANT (§ 330*)—ACTIONS FOR INJURIES TO SERVANT—EVIDENCE—SUFFICIENCY—KNOWLEDGE OF DEFECT BY MASTER.

   In an action to recover for the death of a subcontractor, caused by the falling of a scaffold erected by the principal contractor, evidence *held* sufficient to show that the principal contractor knew or should have known of the unsafe condition of the scaffold caused by a derrick leaning against it.

   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1270–1272; Dec. Dig. § 330.*]

Appeal from Trial Term, New York County.

Action by Ella M. Lester, administratrix, against Samuel E. Graham. From an order of the trial term setting aside a verdict for $4,000 in favor of the plaintiff and granting a new trial, plaintiff appeals. Order reversed, and judgment entered on the verdict.

Argued before INGRAHAM, P. J., and McLAUGHLIN, CLARKE, DOWLING, and HOTCHKISS, JJ.

Gillette & Clark, of New York City (G. Washbourne Smith, of New York City, of counsel, and Ralph Gillette, of New York City, on the brief), for appellant.

Nadal, Jones & Mowton, of New York City (Edward P. Mowton, of New York City, of counsel, and T. G. Cowell, of New York City, on the brief), for respondent.

CLARKE, J.  The defendant was a subcontractor for the erection of a five-story brick house on the southeasterly corner of Ft. Washington avenue and 177th street.  The decedent, John Lester, was a bricklayer and an independent contractor under the defendant Graham to do the front brickwork on the job for $565.  There was another independent contractor by the name of Bain to do the stonework on the building.  He had no relation with Graham, whose contract related to brickwork.  Under the understanding between Lester and Graham, Graham, who was to lay the red brick, was to erect and furnish the scaffolds.  These were actually constructed by his carpenter, McDermott.  The method of construction was by projecting outriggers through the windows about 6 feet; the inside ends being secured to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the beams by metal or wire straps. These outriggers were 7 or 8 feet apart. Two scaffold planks 2½ inches thick by 9 inches wide and 10 or 11 feet long were placed on the outriggers, running parallel with the side of the wall. The inside plank was about 5 inches from the wall. The outriggers were on a slant, about 3 or 4 inches higher on the outside than on the inside. Resting on these two planks were horses about every 8 or 9 feet apart. The top of the horses were wide enough to hold five planks 9 inches wide and about 2½ inches thick. Their legs were 5 feet in height, with about 18 inches spread at the bottom. The inside edge of this platform on the horses was also about 5 inches from the wall or 3 inches where the pilasters ran up.

There was a derrick belonging to, erected, and used by the stone-man for the purpose of raising the lintels. This was located on the curb and was guyed from two stakes in the street, the guy being a continuous rope which ran through a sheave, so that, if one end was unfastened, both guys were loosened. These guys kept the derrick from falling forward towards the building. There was another guy rope which was fastened to the building to prevent it falling backwards into the street. There was also an arm or boom which projected above the top of the building from which hung the block and fall by which the stone lintels were hoisted into position. Lester and his workmen, a bricklayer Bradberry, and an Italian helper, had gone upon the scaffold at about 8 o'clock on the morning of the accident, and were busily engaged in setting bricks, their job being nearly completed, when, between half past 9 and quarter to 10, the scaffolding upon which they were at work suddenly gave way, going down at the end on which Lester was at work about 20 feet away from Bradberry, and going up at his end. Bradberry caught an iron key and a beam, and scrambled to safety, the Italian workman caught a beam from which he was rescued by Bradberry and another man, but Lester fell to the ground, and received injuries from which he died that day. Nothing broke, neither the outriggers, nor the planks upon which the horses rested, nor the horses, nor the planks placed upon the horses. The apparent, immediate, and proximate cause of the disaster was the derrick. It is established that somebody had unfastened one of the guys in the street, and thrown the loose end over to the other stake, the first stake either having been taken out or covered up with sand; the result being that the loosened guys permitted the derrick to rest upon the scaffold. The weight of this derrick with its boom was put at about 1,100 pounds, and the inference is its weight forced the horses off their supporting planks, and caused the fall of the structure.

The learned court sent the case to the jury under section 18 of the Labor Law (chapter 415, Laws 1897, now 31, Cons. Laws; chapter 36, Laws 1909):

"A person employing or directing another to perform labor of any kind in the erection, repairing, altering or painting of a house, building or structure shall not furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders or other mechanical contrivances which are unsafe, unsuitable or improper, and which are not so constructed, placed and operated as to give proper protection to the life and limb of a person so employed or engaged."

A verdict having been rendered for $4,000, the trial court set it aside upon the ground that it was clearly error to submit the case to the jury upon the theory that the right of action, if any, was under section 18 of the Labor Law; that said law was intended by the Legislature to apply to and affect only the rights and liabilities existing between employers and employés; that it is a master and servant law and inapplicable to any other contractual relation.

The respondent states:

"The courts in construing the above section have applied it to situations somewhat similar to that in the present case. These cases are fully referred to under point 1 of appellant's brief. Notwithstanding that the order may not be sustained on the particular ground stated by the court below in setting aside the verdict, if the order setting aside the verdict should be sustained upon other grounds than those stated, if should be affirmed."

We have examined the additional grounds as stated, and find nothing therein to warrant the setting aside of the verdict.

[1] In Quigley v. Thatcher, 144 App. Div. 710, 129 N. Y. Supp. 170, it was held that the employé of a subcontractor who used a scaffolding erected by the contractor could recover against the contractor under section 18 of the Labor Law, saying:

"When Thatcher & Son employed this corporation to do the concreting in the construction of this building the provisions of the Labor Law were written into that contract by operation of law, and section 18 of the Labor Law provides that 'A person employing or directing another (the concrete company) to perform labor,' etc. (quoting the section). * * * This provision, designed to protect laborers, is broad enough in its provisions to protect those employed by the concrete company in carrying out its contract; the provision of the statute is that these mechanical contrivances shall be so 'placed and operated as to give proper protection to the life and limb of a person so employed,' and this means any person who is lawfully engaged in the work."

In Boyle v. Andrew J. Robinson & Co., 154 App. Div. 1, 138 N. Y. Supp. 695, Laughlin, J., said:

"The general contractor, who caused the hoist to be installed for its own use, and the use of its subcontractors and their employés in performing work for it, is clearly liable under the statute, for the hoist at the time of the accident manifestly was unsafe, unsuitable, and improper for such use" (citing cases).

In Huston v. Dobson, 138 App. Div. 810, 123 N. Y. Supp. 892, where an employé of a general contractor fell from a scaffold erected by a subcontractor who was the defendant, Ingraham, P. J., said:

"All parties engaged in this transaction must be presumed to have been familiar with the provisions of the Labor Law and the obligations that it imposed upon an employer to furnish safe and suitable scaffolds. When such scaffolds are furnished, those entitled to use them had a right to rely upon the performance by the defendant of the conditions imposed upon him by law; and thus, when a person lawfully using a scaffold or other appliance is injured in consequence of the negligence of the person whose duty it is to erect such scaffold, a liability exists independent of the actual employment of the person injured."

Defendant is claimed to have known of the dangerous situation. Bradberry testified:

"Immediately after the accident, Mr. Graham was going around, throwing his hands around, crazy from the accident. He said: 'My God! I told him to take the derrick away from that scaffold.' Q. Did he say who he told? A. He told the stoneman—that is just the way he said it; he told the stoneman to take the derrick away from that scaffold."

Graham himself testified:

"I was there Tuesday morning when Lester and Bradberry went to work. I saw the derrick then. I did not notice that the guys were loose. I did not know whether the guys on the derrick on Tuesday morning when I came there at 8 o'clock were tied or slack. I don't remember saying to anybody that I told the stoneman to take away his derrick. On the morning prior to the accident I did not know at any time that the derrick was leaning against the scaffold."

The court charged the jury:

"If you shall find that it was safe and proper as originally constructed, that it was safely and properly maintained so that upon this day in question when this man went upon the scaffold it was a suitable structure for the purpose for which it was intended, that is the end of this case.   *   *   * But if, as I say, it fell by reason of extraneous circumstances over which the defendant had no control, and which with reasonable care and prudence he could not have discovered and prevented, then the plaintiff cannot recover."

After the jury had retired, they came in for further instruction:

"The jury are in doubt," said the foreman, "as to whether there is any outside agency that has to do with the erection and the safety of that scaffold. That is where the point of contention arises.
"The Court: Outside agency, outside person?
"Foreman of the Jury: Anything pertaining to the outside.
"The Court: As to whether the derrick made it unsafe?
"Foreman of the Jury: Yes, sir; that is the point of contention.
"The Court: If it became unsafe from any cause, whether by the act of man upon it after it was built, or by the act of any material object upon it after it was built, or was originally safe, you may determine, and, if it was unsafe in your judgment, then you may find accordingly. In other words, if there was a duty upon this defendant to see to it that that scaffold was safe, why he was bound to see to it that it was safe, no matter by what agency it had become affected. Then it comes to a question as to whether he used, under all circumstances, reasonable care and diligence in its inspection to see if it was kept so.
"Foreman of the Jury: That is all, your honor."

We think this instruction was correct. This duty to furnish includes the duty to maintain, so that the defendant is responsible for the impinging upon the scaffold of the derrick used by an independent contractor. There is sufficient evidence because defendant was on the scaffold that morning and ought to have seen, if he did not, what McDermott, who built the scaffold, saw plainly. McDermott said:

"I knew it was dangerous from the time I got on the scaffold. I knew it was dangerous the moment I got up and saw the boom resting against the planks."

[2] We think that the defendant was liable. He constructed, and caused to be constructed, the scaffold and directed plaintiff's intestate —who, to be sure, was a small contractor, but at the same time a workman—to go upon it to do his work. This was the first time this particular scaffold was used. It fell within an hour after he started to work. The setting aside of the verdict for the reason given was

not authorized. Upon the whole case there was enough to take the question to the jury and to sustain the verdict.

The order appealed from should be reversed, the verdict reinstated and judgment entered thereon, with costs to the appellant. All concur.

WAKEFIELD CONST. CO. v. CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department.    July 10, 1913.)

1. MUNICIPAL CORPORATIONS (§ 354*)—IMPROVEMENT CONTRACT—PERFORMANCE —APPROVAL OF ENGINEER OR BOROUGH PRESIDENT.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 886, 887; Dec. Dig. § 354.*].

2. MUNICIPAL CORPORATIONS (§ 354*) — CERTIFICATE OF ENGINEER — GOOD FAITH.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 886, 887; Dec. Dig. § 354.*]

3. MUNICIPAL CORPORATIONS (§ 354*)—CERTIFICATE OF ENGINEER—EVIDENCE.

Under the terms of a contract for sewer work providing that, if the engineer should be of an opinion that the performance was unnecessarily or unreasonably delayed, he should notify the borough president who might order the work discontinued, the contractor, upon the engineer's certifying his opinion to that effect, was entitled to show what the actual facts were, and whether there were any facts upon which such opinion could have been based.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 886, 887; Dec. Dig. § 354.*]

4. MUNICIPAL CORPORATIONS (§ 374*)—ACTION—SUFFICIENCY OF EVIDENCE— GOOD FAITH OF CERTIFYING ENGINEER.

Evidence in an action for damages for canceling plaintiff's contract for sewer construction, providing that, on the engineer's certificate that performance was unreasonably delayed, the borough president might cancel the contract, held sufficient to sustain a finding that the engineer's

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes